IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LEXINGTON INSURANCE COMPANY,      §
                                  §
            Plaintiff,            §
                                  §
VS.                               §    CIVIL ACTION NO. H-12-0531
                                  §
ACE AMERICAN INSURANCE COMPANY,   §
                                  §
            Defendant.            §

<u>OPINION AND ORDER OF SUMMARY JUDGMENT</u>

Pending before the Court in the above referenced action, arising out of an insurance coverage dispute regarding whether Defendant ACE American Insurance Company ("ACE") had a duty to defend Midcontinent Express Pipeline, LLC ("MEP") and its affiliates, Kinder Morgan, Inc. and Kinder Morgan NatGas Operator, LLC (collectively, the "MEP Parties") in eight underlying lawsuits arising out of a natural gas explosion, are cross motions for summary judgment filed by Plaintiff Lexington Insurance Company ("Lexington")(#23) and by ACE (#27, titled "First Amended Cross-Motion for Summary Judgment").

In its Second Amended Complaint for Declaratory Judgment (#19) and in its motion for summary judgment (#23), Lexington asks the Court to construe two Lexington-issued insurance policies: (1) a commercial general liability policy number 021435609[1] ("Lexington Primary Policy," providing limits of $1 million per occurrence and

---

[1] A copy is found in #23, Ex. B.

$10 million general aggregate) and (2) commercial umbrella liability policy number 021404409 ("Lexington Umbrella Policy," providing limits of $5 million per occurrence and $5 million general aggregate)(collectively, "Lexington Policies"), both issued by Lexington to named insureds Valarco, LLC and Grand Bluff Constructions Services ("Grand Bluff") and effective September 16, 2008-September 16, 2009. It also seeks construction of an ACE commercial general liability policy, number HDO G2374918A,[2] effective January 31, 2009 to January 31, 2010 ("ACE Policy," providing limits of $2 million per occurrence), issued to John Wood Group, Inc. Mustang Engineering L.P. ("Mustang") is insured under the ACE Policy.  Lexington asks the Court for a declaratory judgment that

> (1) [MEP Parties] are additional insureds under [the ACE Policy] . . .; (2) the MEP Parties, as additional insureds under the ACE American policy, are entitled to a defense of underlying lawsuits related to a gas pipeline explosion; and (3) ACE American is liable to Lexington for the costs and expenses that have and will be incurred defending the MEP Parties in the underlying lawsuits.

#19 at p. 1.

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the

---

[2] #23, Ex. C.

affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R, Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Id.* "'On cross-motions for summary judgment'" the court should "'review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Star-Tex Resources, LLC v. Granite State Ins. Co.*, ___ Fed. Appx. ___, 2014 WL 60192, at *2 (5th Cir. Jan. 8, 2014), *citing Ford Motor Co. v. Tex. Dept. of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

The application of the rule depends upon which party bears the burden of proof at trial. If the movant bears the ultimate burden at trial, the movant must provide evidence to support each element of its claim and demonstrate the lack of a genuine issue of material fact regarding that claim. *Rushing v. Kansas City S. Ry.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160

(2000).

If the nonmovant bears the burden of proof at trial, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991); *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 19991).

If the movant meets this burden, the nonmovant must then present competent summary judgment evidence to support each of the essential elements of the claims on which it bears the burden of proof at trial and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

If the movant does not bear the burden of proof at trial, after it points out the absence of evidence of one essential

element of the nonmovant's claim, *Celotex*, 477 U.S. at 325, the nonmovant must go beyond its pleadings and identify specific facts showing that there is a genuine issue of material fact for trial. *Id.* at 324.  If the nonmovant fails, all other facts are immaterial and summary judgment is mandatory. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76(5ᵗʰ Cir. 1994)(*en banc*).

"'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5ᵗʰ Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5ᵗʰ Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5ᵗʰ Cir. 1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713.  Conclusory statements are not competent evidence to defeat summary judgment.  *Turner*, 476 F.3d at 346-479 (plaintiff "must offer specific evidence refuting the factual allegations underlying [defendant's] reasons for her termination), *citing Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5ᵗʰ Cir. 1992).  "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

**Allegations of Lexington's Second Amended Complaint (#19)**

MEP and Mustang entered into a Professional Services Agreement ("PSA")(copy at #23, Ex. D, in which MEP is referred to as "Company" and Mustang as "Contractor" or "Consultant"),[3] effective January 1, 2007, which in relevant part provides,

13. <u>GENERAL INDEMNITY</u>

CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD COMPANY HARMLESS FROM AND AGAINST ALL CLAIMS, DAMAGES,, LIABILITY, LOSSES AND EXPENSES INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S FEES AND OTHER COSTS OF DEFENSE ATTRIBUTABLE TO BODILY INJURY, SICKNESS, DISEASE, DEATH OR INJURY TO THE EMPLOYEES OF CONTRACTOR OR DESTRUCTION OF PROPERTY OF CONTRACTOR, INCLUDING LOSS OF USE RESULTING THEREFROM AND ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PERFORMANCE OF WORK HEREUNDER, IRRESPECTIVE OF COMPANY'S FAULT OR NEGLIGENCE. LIKEWISE COMPANY SHALL DEFEND, INDEMNIFY AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ALL CLAIMS, DAMAGES, LIABILITY, LOSSES AND EXPENSES INCLUDING BUT NOT LIMITED TO ATTORNEY'S FEES AND OTHER COSTS OF DEFENSE ATTRIBUTABLE TO BODILY INJURY, SICKNESS, DISEASE, DEATH OR INJURY TO THE EMPLOYEES OF COMPANY OR DESTRUCTION OF PROPERTY OF COMPANY, INCLUDING LOSS OF USE RESULTING THEREFROM AND ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE PERFORMANCE OF WORK THEREUNDER, IRRESPECTIVE OF CONTRACTOR'S FAULT OR NEGLIGENCE. WHEN ANY INJURIES, DEATH OR ILLNESS OR DAMAGE TO PROPERTY ARE SUSTAINED BY THIRD PARTIES, AND ARE THE CONCURRENT CONTRIBUTION OF BOTH COMPANY AND CONTRACTOR, EACH PARTY'S DUTY OF INDEMNIFICATION SHALL BE IN THE SAME PROPORTION THAT THE ACTS OR OMISSIONS OF EACH PARTY CONTRIBUTED TO THE

---

[3] #23, Ex. D.

INJURIES, DEATH OR ILLNESS OR DAMAGE TO PROPERTY.

14.   <u>INSURANCE</u>

14.1   Contractor agrees to carry and maintain the following insurance, from carriers with an A.M. rating of at least A-/VIII[4]: . . . .

> 14.1.3 <u>Commercial General Liability Insurance</u> insuring the indemnity agreement set forth in this contract with a single limit of not less than $2,000,000 per occurrence and in the aggregate.   All policies shall include coverage for blanket contractual liability assumed hereunder . . . .

> 14.2   Solely to the extent of Consultant's indemnity obligation (with the exception of Worker's Compensation) all insurance policies carried by the Contractor hereunder shall name (i) Midcontinent Express Pipeline LLC, (ii) its respective affiliates, and (iii) its and their affiliates' respective directors, officers, agents, and employees, and (iv) the respective successors and assigns of all the foregoing entities and persons as additional insureds with respect to liability arising out of work performed by Contractor or subcontractor, as applicable. . . .

> [14.4 Before commencing any performance under this Agreement, Contractor shall furnish Company with Certificates of Insurance evidencing insurance coverage and provisions provided for in this Agreement.   Failure of Contractor to furnish such evidence of insurance coverage shall not be considered a waiver by Company of such coverage.   All insurance certificates shall include the following statement:

> > Midcontinent Express Pipeline LLC, its respective affiliates, its and

---

[4] Lexington argues that this provision requires Mustang to add the MEP Parties as additional insureds to Mustang's insurance policies.

their respective directors, officers, agents and employees, and the respective successors and assigns of all the foregoing entities and persons are named as additional insured on all above policies (except Worker's Compensation) and waiver of subrogation is granted in favor of Midcontinent Express Pipeline LLC, its respective affiliates, its and their affiliates' respective directors, officers, agents and employees and the respective successors and assigns of all the foregoing entities and persons to the extent permitted by applicable law.][5]

14.5 Solely to the extent of the Consultant's indemnity obligation, this insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to or maintained by Company, and shall not require the exhaustion of any other coverage.

The Lexington Primary Policy's provision (Sec. V, 4.) entitled

"Other Insurance" states in relevant part,

**4.    Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Policy, our obligations are limited as follows:

**a.    Primary Insurance**

This insurance is primary except when b. Excess Insurance, below, applies. If this insurance is primary, our obligations are not

---

[5] Section 14.4 is not quoted in the Second Amended Complaint, but because ACE relies on it, the Court has included it, in context, here.

affected unless any of the other insurance is also primary.  Then we will share with all that other insurance by the method described in c. Method of Sharing, below.

**b.  Excess Insurance**

This insurance is excess over: . . . .

(2)  Any other primary insurance available to you covering liability for damages arising out of the premises or operations or the "products-completed operations hazard" for which you have been added as an additional insured by attachment of an endorsement.

When this coverage is excess, we will have no duty under Coverages A or B to defend the insured against a "suit" if any other insurer has a duty to defend the insured against that "suit."  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .

**c.  Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes an equal amount until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of all insurers.

The Lexington Umbrella Policy's "Other Insurance" provision states in pertinent part,

**K.    Other Insurance**

> If other valid and collectible
> insurance applies to damages that
> are also covered by this policy,
> this policy will apply excess of the
> "other insurance."  However this
> provision will not apply if the
> other insurance is specifically
> written to be excess of this policy.

The ACE Policy includes provisions stating that (1) ACE "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies"; (2) the "'bodily injury or 'property damage' must be caused by an 'occurrence'"; and (3) ACE "will have the right and duty to defend the insured against any 'suit' seeking those damages."  Ex. C at Section I, 1., a.

Endorsement 18 to the ACE Policy (#29-2 Ex. B-1, Endorsement 18) changes the named insured shown in the declarations to include *inter alia* John Wood Group PLC and "any organization . . . over which you or your subsidiary currently maintain ownership or majority interest."  Mustang is a subsidiary of John Wood Group PLC and thus is a named insured under the ACE Policy.  *Id.*[6]

The ACE Policy includes Endorsement 20, "Additional Insured Designated Person or Organization," which alters the coverage provided under the policy form as follows:

> Section II--Who Is an Insured is amended to include as an
> additional insured any person or organization to whom you

---

[6] ACE agrees.  #27, p. 4.

are obligated, in connection with your business, by
written contract or written agreement, executed prior to
the date of loss, to provide insurance such as is
afforded by this policy, but not for broader coverage or
greater limits of liability than is required by said
contract or agreement and in no event, for broader
coverage or greater limits of liability than is otherwise
provided by the policy. If other insurance is available
to an insured we cover under this endorsement or
described above (the "Additional Insured") for a loss we
cover under this policy, this insurance will apply to
such loss on a primary basis and we will not seek
contribution from the other insurance available to the
Additional Insured.

Ex. C, Endorsement 20. Endorsement 20 makes coverage afforded to

an additional insured primary to any other insurance with respect

to the loss covered under the ACE Policy.

Lexington's complaint alleges that on or about July 15, 2009

there was an explosion at a natural gas compressor station during

a pressure test of a pipeline owned and operated by the MEP

Parties. The alleged cause was an improperly assembled or designed

separator door or separator cover that failed during the test. One

person was killed and four others injured. Arising from this

occurrence, the following eight lawsuits (collectively, the

"underlying lawsuits") were subsequently filed against the MEP

Parties and Mustang:

1. *Jeremy Cannon and Carl Harrington v. Kinder Morgan,
Inc., Kinder Morgan NatGas Operator, LLC, and
Midcontinent Express Pipeline, LLC*, et al., Cause No.
2009-52848, in the 189th Judicial District Court of
Harris County, Texas[7];

---

[7] See #23, Ex. E for copy of the Fifth Amended Petition for
Damages in this case.

-11-

2. *Richard D. Leigh and Leigh Ann Lee v. Kinder Morgan, Inc., Kinder Morgan NatGas Operator, LLC, et al.*, Cause No. 2011-14924, in the 133rd Judicial District Court of Harris County, Texas[8];

3. *Judith Clare LeBlanc Candler and David Lynn Matthew v. Midcontinent Express Pipeline, LLC and Kinder Morgan, Inc., et al.*, Docket No. 92439 "E" in the 15th Judicial District, Parish of Vermilion, Louisiana[9];

4. *David Lynn Matthew, et al. v. Grand Bluff Construction Company, Inc., Midcontinent Express Pipeline, LLC, et al.*, Docket No. 92472 "D" in the 15th Judicial District, Parish of Vermilion, Louisiana[10];

5. *Thomas Wayne Williams v. Priority Energy Services, LLC, Midcontinent Express Pipeline, LLC, et al.*, Cause No. 2011-209 in the Circuit Court of Smith County, Mississippi;[11]

6. *Bryce Case v. Kinder Morgan, Inc., et al.*, Cause No. 2012-207, in the Circuit Court of Smith County, Mississippi[12];

7. *Casey Bertrand v. Kinder Morgan, Inc., et al.*,Cause No. 2012-208, in the Circuit Court of Smith County, Mississippi[13]; and

---

[8] See #23, Ex. G for copy of the Original Petition.

[9] #23, Ex. F-1 for Petition for Damages; Ex. F-2 for First Amending [*sic*] Petition for Damages; Ex. F.-3 for Second Supplemental and Amending Petition for Damages; Ex. F-4, Third Supplemental and Amending Petition for Damages.

[10] #23, Ex. H-1, Petition for Damages; Ex. H-2, First Amending Petition for Damages; Ex. H-3, Second Supplemental and Amending Petition for Damages; Ex. H-4 Third Supplemental and Amending Petition for Damages.

[11] #23, Ex. I, Complaint.

[12] #23, Ex. J, Complaint.

[13] #23, Ex. K, Complaint.

8. *Dillan Guillory v. Kinder Morgan, Inc., et al.*, Cause No. 2012-209 in the Circuit Court of Smith County Mississippi.[14]

These suits claim that the defendants were negligent in the following acts or omissions: (1) failure to perform a proper visual line inspection of the pipeline before pressure testing and failure to properly conduct pressure testing of the pipeline; (2) failure to supervise the pressure testing of the pipeline; (3) failure to properly service and direct the opening and closing of the separator door; (4) failure to safely design and engineer the separator and its door; (5) failure to warn of the dangers associated with opening and closing the separator door; and (6) failure to inform the underlying suits' plaintiffs that the test pressure had been reached or 50% of the test pressure had been reached and to move beyond the perimeter.

Lexington, alone among the insurers, has been defending the MEP Parties in these underlying lawsuits under a reservation of rights[15] and has incurred significant costs and expenses. Through

---

[14] #23, Ex. L, Complaint.

[15] The Texas Supreme Court defines a "reservation of rights" as

the notification to the insured that the insurer will defend the insured, but that the insurer is not waiving any defenses it may have under the policy, and it protects an insurer from a subsequent attack on its coverage position on waiver or estoppel grounds. Once a defense is taken under a valid reservation of right, the insurer may withdraw the defense when it becomes clear that there is no coverage under the applicable policy. The purpose of the reservation of rights

its attorney, on July 29, 2011 Lexington tendered the defense of the MEP Parties to ACE.  On February 13, 2012, ACE denied coverage for the MEP Parties as additional insureds under the ACE Policy and refused to defend the MEP Parties in these underlying lawsuits.

Lexington contends that the MEP Parties are additional insureds under the ACE Policy because the PSA requires Mustang's insurance policies, including the ACE Policy, to name the MEP Parties as additional insureds.  Lexington further insists that Endorsement 20 to the ACE Policy expressly gives additional insured status to the MEP Parties as parties to whom Mustang is obligated by written agreement to provide insurance.[16]

---

        letter is to permit the insurer to provide a defense
        for its insured while it investigates questionable
        coverage issues.

*Stewart Information Services Corp. v. Great American Ins. Co.*, ___ F. Supp. 2d ___, Civ. A. No. H-11-2951, 2014 WL 583965, at *20 (S.D. Tex. Feb. 12, 2014), *citing Canal Ins. Co. v. Flores*, 524 F. Supp. 2d 828, 833 (W.D. Tex. 2007), *citing Texas Ass'n of Counties County Government Risk Management Pool v. Matagorda County*, 52 S.W. 2d 128, 133 (Tex. 2000).

[16] "Under Texas law, additional insureds are strangers to an insurance policy and must bear the burden of proving additional insured status."  *Republic Waste Services of Texas, Ltd. v. Empire Indemnity Ins. Co.*, No. 03-41270, 98 Fed. Appx. 970, 971 (5th Cir. May 7, 2004).  Here Lexington argues that, in subrogation, it stands in the MEP Parties' and Mustang's shoes as additional insureds in seeking reimbursement for defense fees and costs.  Lexington thus bears the burden of proof that the MEP Parties and Mustang are additional insureds.
        In *Mid-Continent Ins. Co. v. Liberty Mutual Ins. Co.*, 236 S.W. 3d 765, 774 (Tex. 2007), the Texas Supreme Court opined,

        There are two types of subrogation.  Contractual (or
        conventional) subrogation is created by an agreement or

In addition, Lexington, as the excess insurer, claims that ACE owed and continues to owe the MEP Parties, as additional insureds, a defense in the underlying lawsuit because the defense obligation under the ACE Policy requires ACE to pay to Lexington contribution for past and future defense costs and expenses.  Based on contractual and equitable subrogation rights, Lexington contends that it is entitled to recover from ACE all defense costs and expenses incurred in defending the MEP Parties because of ACE's breach of its obligations under the ACE Policy.  Alternatively, Lexington asserts that these defense costs and expenses should be shared between Lexington and ACE on a *pro rata* basis.

In sum, Lexington seeks a declaratory judgment that (1) the MEP Parties are additional insureds under the ACE Policy; (2) ACE owes a complete defense to the MEP Parties; and (3) Lexington's contractual and equitable subrogation rights entitle it to recover from ACE costs and expenses that have been and will be incurred in

---

contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss, while equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter. . . . In either case, the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured.

Lexington claims contractual subrogation under its reservation of rights letter (#23, Ex. M) and equitable subrogation.

defending the MEP Parties in the underlying lawsuits, or, alternatively, ACE is liable to Lexington for contribution for ACE American's pro rata share of the costs and expenses of defending the MEP Parties.

## Relevant Law

Where jurisdiction is grounded in diversity, as it is in this case, the court applies the substantive law of the forum state, here Texas. *Bayle v. Allstate Ins. co.*, 615 F.3d350, 355 (5th Cir. 2010). Lexington is a Delaware corporation with its principal place of business in Boston, Massachusetts while ACE is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania, and thus the parties are completely diverse. Moreover, under Texas Insurance Code Art. 21.42,

> Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of, the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporations issuing the same.

John Wood Group is the named insured under the ACE Policy and is located in Houston Texas, so Texas law applies to the ACE Policy. Ex. C at Declarations.

Paragraph 20 of the PSA contains a choice-of-law and choice-of-forum provision, which states in relevant part:

-16-

**GOVERNING LAW AND FORUM**

This agreement, its interpretation and any disputes relating to, arising out of or connected with this Agreement shall be governed by the laws of the state of Texas, without regard to its conflicts of law provisions. Any dispute relating to, arising out of, or connected with this Agreement shall be filed and maintained in Houston, Harris County, Texas, or, if not in arbitration pursuant [to] the appropriate section hereof, in the state of Federal Courts located in Houston, Harris County Texas.

Texas Courts look to the *Restatement (Second) of Conflicts of Law* § 187 for contracts that contain an express choice of law. *DeSantis v. Wackenhut Corp.*, 793 S.W. 2d 670, 677–78 (Tex. 1990); *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W. 3d 228, 231 (Tex. 2008). Section 187 provides in pertinent part,

Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable

-17-

> law in the absence of an effective choice of
> law by the parties.

Therefore interpretation of the PSA is also governed by Texas law.

In Texas, the interpretation of an insurance policy is a question of law for the court. *Lawyers Title Ins. Corp. v. Doubletree Partners, LP*, 739 F.3d 848, 858 (5th Cir. 2014), *citing N.Y. Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). The general rules of contract construction apply to the interpretation of the terms of an insurance contract. *State Farm Life Ins. Co. v. Beaston*, 907 S.W. 2d 132, 133 (Tex. 1995). Words are given their ordinary meaning unless the policy indicates that they are meant in a technical or different sense. *Sec. Mutual Cas. Co. v. Johnson*, 584 S.W. 2d 703, 704 (Tex. 1979). In construing a contract, the court must try to ascertain the intentions of the parties as expressed in the contract. *Lawyers Title*, 739 F.3d at 858. In determining the intent of the parties, the court must examine the contract as a whole and give effect to each provision so that none is rendered meaningless and none, taken alone, is given controlling effect. *Coker v. Coker*, 650 S.W. 2d 391, 393–94 (Tex. 1983); *Gilbert Texas Constr., LP v. Underwriters at Lloyd's London*, 327 S.W. 3d 118, 133 (Tex. 2010).

Whether an insurance policy is ambiguous is a question of law for the court. *Canutillo I.S.D. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996); *Lane v. Allstate Ins. Co.*, Civ. A.

No. H-04-3555, 2005 WL 6454486, at *3 (S.D. Tex. Nov. 21, 2005). If the language of the contract can be given a clear and definite legal meaning, it is not ambiguous as a matter of law and must be enforced as written. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W. 3d 164, 168 (Tex. 2009). If the contract has a doubtful or uncertain meaning or is reasonably susceptible to multiple interpretations, it is ambiguous. *Id.* A contract is not ambiguous merely because the parties disagree about its meaning. *Dynegy*, 294 S.W. 3d at 168. If the policy is ambiguous, the court must adopt the construction most favorable to the insured and construe the policy against the drafter, i.e., the insurer. *Barnett v. Aetna Life Ins. Co.*, 723 S.W. 2d 663, 666 (Tex. 1987). "Texas law has consistently held that, if an insurance coverage provision is susceptible to more than one reasonable interpretation, the court must interpret the provision in favor of the insured, so long as that interpretation is reasonable. The court must do so even if the insurer's interpretation is *more* reasonable than the insured's--'[i]n particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.'" *In re Deepwater Horizon*, 728 F.3d 491, 499 (5th Cir. 2013), *citing Nat'l Union Fire Ins. Co. of Pittsburgh, Pas. v. Hudson Energy Co.*, 811 S.W. 2d 552, 555 (Tex. 1991), and *Evanston Ins. Co. v. ATOFINA*

*Petrochemicals, Inc.*, 265 S.W. 3d 660, 668 n.27 (Tex. 2008).
Exceptions or limits on liability especially are interpreted
against the insurer and in favor of the insured.  *Hudson Energy*,
811 S.W. 2d at 555.

A liability insurer owes to its insured a duty to defend and
a duty to indemnify.  In Texas the duty to defend and the duty to
indemnify "are distinct and separate duties creating distinct and
separate causes of action." *D.R. Horton-Tex., Ltd. v. Markel Int'l
Ins. Co.*, 300 S.W. 3d 740, 743 (Tex. 2009), *cited for that
proposition, Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589,
594 (5th Cir. 2011).  "Thus an insurer may have a duty to defend
but, eventually, no duty to indemnify." *Farmers Texas County
Mutual Ins. Co. v. Griffin*, 955 S.W. 2d 81, 82 (Tex. 1997).

A duty to indemnify depends on the facts that establish
liability in the underlying lawsuit and whether any damages caused
by the insured and later proven at trial are covered by the terms
of the insurance policy.  *ACE Am. Ins. Co. v. Freeport Welding &
Fabricating, Inc.*, 699 F.3d 832, 844 (5th Cir. 2012); *D.R. Horton*,
300 S.W. 3d at 744.  Therefore an insurer's duty to indemnify can
only be determined after the underlying litigation has been
resolved.  *Id., citing Columbia Cas. Co. v. Ga. & Fla. RailNet,
Inc.*, 542 F.3d 106, 111 (5th Cir. 2008).

An insurer's duty to defend is a question of law.  *Id.,
quoting Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469,

471-72 (5th Cir. 2009).  In Texas, under the "eight corners" rule, an insurer's duty to defend is determined by two documents, the third-party plaintiff's pleadings, without regard to the truth of those allegations, and the insurance policy.  *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012), *citing GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W. 3d 305, 307-08 (Tex. 2006)(Facts outside the four corners of these two documents are generally "not material to the determination and allegations against the insured are liberally construed in favor of coverage."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Merchants Fast Motor Lines, Inc.*, 939 S.W. 2d 139, 141 (Tex. 1997).  The court should read the allegations liberally, with any doubts resolved in favor of the insured.  *Guar. Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 243 (5th Cir. 2000).  "Even if the allegations are groundless, false or fraudulent, the insurer is obligated to defend."  *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W. 3d 487, 491 (Tex. 2008).  "If *any* allegation in the complaint is *even potentially* covered by the policy then the insurer has a duty to defend its insured."  *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d546, 552 (5th Cir. 2000)(emphases in original).[17]  The insurer's duty to defend

---

[17] *See* 14 *Couch on Insurance* § 200:3:

> The distinction between the duty to defend and the duty
> to indemnify is based upon the time when the duties are
> determined.  The duty to defend arises prior to the

"is broader than its duty to indemnify." *St. Paul & Marine Ins. Co. v. Green Tree Financial Corp.-Texas*, 249 F.3d 389, 391 (5th Cir. 2001), *citing St. Paul Ins. Co. v. Texas Dep't of Transp.*, 999 S.W. 2d 881, 884 (Tex. App.--Austin 1999, writ denied).  If any portion of the underlying suit is covered, the insurer must defend the entire suit.  *Id., citing id.*

Where the court determines under the eight corners doctrine that the primary insurer has a duty to defend but breaches that duty and refuses to do so, a subrogation clause in a policy can entitle the insurer who took over the defense to recover defense costs from the primary insurer.  *See Continental Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 87 (5th Cir. 2012)(based on clause stating "[i]f any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us," the court held, "Under the terms of the subrogation clause, the [umbrella insurer] is entitled to reimbursement from the insurers who should have borne the costs that it paid.").  The Lexington Policy states that "if the insured

---

completion of litigation, and therefore insurers are required to meet their defense obligation before the scope of the insured's liability has been determined. In contrast, because the duty to defend arises whenever an insurer ascertains facts that give rise to the possibility or the potential of liability to indemnify, the duty to defend must be assessed at the very outset of a case, unlike the duty to indemnify, which arises only when the insured's underlying liability is established.

has rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us." Ex. B at Section V, 8.  Furthermore the "other insurance" clause in the Lexington Policy provides, "If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers." Ex. B at Section V, 4, b.  To prevail on a claim for contribution, a party must demonstrate that "several insurers share a common obligation or burden and the insurer seeking contribution has made a compulsory payment or other discharge of more than its fair share of the common obligation or burden." *Mid-Continent*, 236 S.W. 3d at 772, *citing Employers Cas. Co. v. Trans. Ins. Co.*, 444 S.W. 2d 606, 609 (Tex. 1969).  In *Mid-Continent* the Texas Supreme Court held that when the insurance policies of primary co-insurers containing "other insurance clauses," "a co-insurer paying more than its proportionate share cannot recover the excess from the other co-insurers" for their breach of the duty to indemnify through contribution because the insurers did not share a common obligation since the pro rata clauses made the contracts several and independent of each other. *Mid-Continent*, 236 S.W. 3d at 772.  In *Trinity Universal Ins. Co. v. Employers Mutual Casualty Co.*, 592 F.3d 687, 694 (5th Cir. 2010), the Fifth Circuit clarified that ruling in *Mid-Continent and* opined that the "other insurance" clauses apply only to the duty to indemnify.  In contrast where the court finds that the allegations

in a third-party suit against an insured fall within the scope of the insurance policy's coverage and a co-insurer breaches its duty to defend, which under Texas law is a separate and broader duty than its duty to indemnify, and because the insurer has a duty to provide a complete defense even if only one of several claims falls within the policy's coverage, a co-insurer who can satisfy the elements of a claim for contribution can sue to recover its defense costs. *Id.* at 694-95.

### Lexington's Motion for Summary Judgment (#23)

Asserting that there are no genuine issues of material fact regarding coverage, Lexington moves for summary judgment on the grounds that ACE owes a duty to defend their common insureds, the MEP Parties, in the eight lawsuits arising out of the natural gas pipeline explosion in Smith County, Mississippi.  So far, because of ACE's refusal to assume its obligation to provide a defense, Lexington alone has borne the burden and the costs and expenses, even though the MEP Parties are additional insureds under the insurance requirement and the indemnity provision of the PSA, and under the additional insured endorsement in the ACE Policy, which also provides the MEP Parties with primary coverage.  ACE's duty to defend is based solely on the allegations in the pleadings in the underlying lawsuit.  The ACE Policy expressly provides primary coverage, and the additional insured endorsements in the Lexington Policies provide excess coverage.  Accordingly, Lexington is entitled to recover all defense costs in defending the MEP Parties

because of its contractual and equitable subrogation rights as an excess insurer above the ACE Policy.  Alternatively, it is at least entitled to a contribution from ACE of half of the defense costs that have been and will be incurred in defending the MEP Parties.

In addition to other provisions already mentioned,      the Lexington Policy states at Ex. B, Section I, Coverage A, 1.a, that Lexington "will have the right and duty to defend the insured" against any suit seeking damages for "bodily injury" or "property damage," as defined in the policy.  Lexington maintains that the MEP Parties are additional insureds under the Lexington Policy's Endorsement No. 10, B, 6, "Additional Insured Required by Written Contract," which provides that coverage for the additional insured is excess of other insurance:

> **6.** Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured, whether primary, excess, contingent or on any other basis unless a written agreement specifically requires that this insurance apply on a primary or non-contributory basis.

As noted *supra*, under 4.b, **"Other Insurance," "Excess Insurance,"** when the policy is excess, Lexington has no duty to defend the insured against any "suit" if another insurer has a duty to defend the insured against that "suit."  Last of all, Ex. B, Section V, 8 of the Lexington Policy provides that any rights held by the insured to recover all or part of any payment made under the policy are transferred to Lexington:

-25-

### 8.   Transfer of Rights of Recovery Against Others To Us

> If the insured has rights to recover all or
> part of any payment we have made under this
> Policy, those rights are transferred to us.
> The insured must do nothing after loss to
> impair them.  At our request, the insured will
> bring "suit" or transfer those right to us and
> help us enforce them.

Under the commercial general liability policy issued by ACE to
John Wood Group PLC, ACE "will pay those sums that the insured
becomes legally obligated to pay as damages because of 'bodily
injury' or 'property damage.'" and "will have the right and duty to
defend the insured against any 'suit' seeking those damages."  Ex.
C, Section I, 1., a.  The bodily injury or property damage must be
caused by an "occurrence" during the period the policy is in
effect.  *Id.* at Section I, b., (1).  The ACE Policy defines "bodily
injury" as "bodily injury, sickness or disease sustained by a
person, including death resulting from any of these at any time.
*Id.* at Section V, 3.  "Occurrence" is defined as "an accident,
including continuous or repeated exposure to substantially the same
general harmful conditions."  *Id.* at Section V, 13.  "Suit" is
defined as "a civil proceeding in which damages because of 'bodily
injury,' 'property damage,' or 'personal and advertising injury' to
which the insurance applies are alleged."  *Id.* at Section V, 18.

As noted, Section II of Endorsement 20 to the ACE policy,
quoted *supra*, provides coverage to parties to whom Mustang is
obligated to provide insurance as additional insureds, and it
states that the ACE Policy will be primary to any other insurance
available to an additional insured.  Section 14.1, also quoted

*supra*, requires Mustang to add the MEP Parties as additional insureds to Mustang's insurance policies.

The pipeline that exploded at a natural gas compressor station on July 15, 2009 during a pipeline pressure test, allegedly because of an improperly assembled or designed separator cover or separator door that failed during the test, was purportedly owned and operated by the MEP Parties and designed and engineered jointly by the MEP Parties and Mustang.  In its motion for summary judgment Lexington addresses the eight lawsuits filed on behalf of the employees who were injured or killed, each charging negligence against multiple defendants, including the MEP Parties and Mustang, and asserting that the plaintiffs' injuries were concurrently caused by the MEP Parties and Mustang.  The MEP Parties tendered the defense of the underlying lawsuits to Lexington on January 21, 2010.  Ex. A at ¶ 7.  On April 9, 2010 Lexington agreed to defend them under a reservation of rights and on a *pro rata* basis with other insurers obligated to defend the MEP Parties. Ex. A at ¶ 7; Ex. M.  These underlying suits are still pending, and by the time of the filing of Lexington's motion for summary judgment, Lexington claims, as the only insurer defending the MEP Parties, that it had incurred more than $1,793,535.49 in defense costs and fees.

Lexington's counsel sent ACE notice of the underlying lawsuits and claims in a letter dated July 29, 2011 and requested that ACE assume their complete defense (Ex. N).  In a response dated August 24, 2011 ACE asked Lexington to provide additional materials for it to evaluate the claim.  Ex. O.  Lexington sent these materials on

October 13, 2011.  Ex. P.  Not until February 13, 2012 did ACE deny a defense to the MEP Parties on the ground that the PSA's indemnity provision was not triggered and therefore there was no additional insured coverage for MEP or Kinder Morgan.  Ex. Q at 4.

Lexington filed the instant suit on February 22, 2012, citing the first five lawsuits against the MEP Parties.  Subsequently it learned of the other three (Exs. J, K, and L), of which it notified ACE and tendered defense to ACE by letter of September 10, 2012. Ex. R.  ACE did not respond.

Lexington points out that the Fifth Circuit has opined, "Texas courts enforce an insurer's duty to defend even when an insurer's duty to indemnify is not yet settled." *St Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.*, 249 F.3d 389, 391 (5th Cir. 2001). Looking to the terms of the ACE Policy and construing the factual allegations in the third parties' pleadings liberally in favor of the insured, Lexington argues that under Endorsement 20 of the ACE Policy, Mustang is obligated to look to its written contract (the PSA, Ex. D,) to determine whether Mustang agreed in a written contract to provide insurance to the MEP Parties as additional insureds.  The PSA, Ex. D at ¶ 14.2, provides, "Solely to the extent of [Mustang's] indemnity obligation . . . all insurance policies carried by [Mustang] hereunder shall name [the MEP Parties] . . . as additional insureds with respect to liability arising out of work performed by [Mustang] . . ."  The lawsuits claim that Mustang performed work on the pipeline where the explosion happened and that the MEP Parties and Mustang are

concurrently liable for Plaintiffs' injuries. Therefore the additional insured status of the MEP Parties is "with respect to liability arising out of" Mustang's work. *See Rouse v. Greyhound Rent-A-Car, Inc.*, 506 F.2d 410, 414 n.3 (5th Cir. 1975)(construing "arising out of" to ordinarily mean "originating from, incident to, or connected with the item in question"). The phrase, "solely to the extent of [Mustang's] indemnity obligation," limits the PSA's requirement that the MEP Parties be added as additional insureds because whether they are additional insureds depends on whether Mustang's indemnity obligation under the PSA is " *potentially* triggered," a determination also made based on allegations in the underlying pleadings. *Merchants Fast Motor Lines*, 939 S.W. 2d at 141.

The PSA's indemnity provision applies when any injuries, death, or illness to third parties is the "concurrent contribution of both [MEP] and [Mustang]." The plaintiffs in all eight suits are employees of contractors other than Mustang or the MEP Parties, and therefore are third parties, and they have claimed that Mustang and the MEP Parties are responsible for the bodily injuries or the deaths of the plaintiffs. Each of the eight suits asserts one or more of the negligence allegations listed on pages 12-13 of this Opinion and Order against the MEP Parties and Mustang and that those failures concurrently caused injury or death to the plaintiffs. See #23, pp. 16-19. Thus these allegations in all eight suits trigger Mustang's indemnity obligation under the PSA and the MEP Parties are entitled to a defense as additional

insureds under the ACE Policy.

In its February 13, 2012 letter denying an obligation to defend the MRP Parties, ACE asserted that the MEP Parties were not additional insureds under its Policy because Mustang's "indemnity obligation is not triggered." Ex. Q at p. 4.  Lexington insists that this argument is contrary to Texas law that an insurer's duty to defend and duty to indemnify are "distinct and separate duties" and that the duty to defend is based only on the allegations in the underlying pleadings. *King v. Dallas Fire Ins. Co.*, 85 S.W. 3d 185, 187 (Tex. 2002). Mustang's duty to indemnify in the PSA is also determined by the allegations in the pleadings. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d at 840 (holding that an exception to complaint allegation rule allowing examination of extrinsic evidence "is limited to cases where 'it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.'")(*citing Ooida Risk*, 579 F.3d at 475)). In sum, the ACE Policy provides additional insured coverage to the MEP Parties because Mustang agreed to add them as additional insureds under the PSA and because the allegations in the underlying lawsuits, taken as true, potentially trigger Mustang's indemnity obligation. The underlying suits' allegations of negligence and physical injuries caused by the explosion constitute "suits' seeking damages because of the "bodily injury" caused by an

"occurrence" during the policy period and fall within the Policy's scope of coverage.  Any doubt must be resolved in favor of the insured.  *Merchants Fast Motor Lines*, 939 S.W. 2d at 141.  To the extent that any allegations in the underlying suits's pleadings fall outside the scope of coverage, "[i]f coverage is found for any portion of a suit, the insurer must defend the entire suit."  *Scottsdale Ins. Co. v. Travis*, 68 S.W. 3d 72, 75 (Tex. App.--Dallas 2001, pet. denied).  The insurer "may have a duty to defend but, eventually no obligation to indemnify."  *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W. 3d 487, 490-91 (Tex. 2008), *citing Farmers Tex. Cnty. Mut. Ins.*, 955 S.W. 2d at 82.

The unambiguous language of the ACE Policy provides primary coverage to the MEP Parties: Endorsement 20 states, "If other insurance is available to an insured we cover under this endorsement or described above (the "Additional Insured") for a loss we cover under this policy, this insurance will apply to such loss on a primary basis and we will not seek contribution from the other insurance available to the Additional Insured."  Ex. C at Endorsement 20.  The Lexington Policy, in contrast, provides excess coverage by its additional insured endorsement:  "Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis . . . ."  Ex. B at Endorsement 10.  The Court should conclude from the plain language of these provisions that the ACE Policy is primary and the Lexington Policy is excess.

-31-

Together they do not conflict and they work so that the MEP Parties
are never deprived of coverage.

Lexington notes that in *Hardware Dealers Mutual Fire Ins. Co.
v. Farmers Ins. Exchange*, 444 S.W. 2d 583, 586 (Tex. 1969), the
Texas Supreme Court determined that "other insurance" provisions in
two insurance policies conflicted where the insured "would be
covered by either policy but for the existence of the other."  To
protect policyholders, it concluded that insurers with conflicting
"other insurance" provisions must equally provide coverage by
proration "in proportion to the amount of insurance provided by
their respective policies."  *Id.* at 590.  Subsequently in *Royal
Ins. Co. of Am. v. Hartford Underwriter Ins. Co.*, 391 F.3d 639,
642-44 (5th Cir. 2004), the Fifth Circuit read *Hardware* broadly and
held that "even when a plausible interpretation of opposing 'other
insurance' clauses would render one policy's coverage primary and
the other's excess, if a 'reasonable construction' of the two
policies from the insured's perspective would result in full
coverage under each policy but for the existence of the other, the
policies conflict and liability should be apportioned pro rata."
*Am. States Ins. Co. v. ACE Am. Ins. Co.*, 547 Fed. Appx. 550, 553 &
n.11 (5th Cir. Nov. 19, 2013), *citing Travelers Lloyds ins. Co.*, 602
F.3d at 685-86 ("holding that the district court's reading of
concurrent 'other insurance' clauses as not in conflict was
contrary to Fifth Circuit precedent because one policy could

-32-

'reasonably be construed to mean that [its] policy is excess when other insurance is available unless the other insurance either specifically references [the] policy and states that it is excess to [it], or the other insurance provides that it applies only as excess insurance above [the specific liability limits of the first policy,]' which the other insurance did not, thus yielding a conflict."). Lexington insists that no conflict exists between the Lexington and ACE Policies because the apportionment of coverage resulting from a proper interpretation of the policy language here always provides primary coverage to the MEP Parties since the ACE Policy provides primary coverage regardless of the existence of other insurance (if other insurance is available, "this insurance will apply to such loss on a primary basis and we will not seek contribution from other insurance available to the Additional Insured"). Ex. C at Endorsement 20. Thus MEP Parties will always have primary coverage and there is no conflict issue.

Moreover because not only is the Lexington Policy excess to the ACE Policy, but pursuant to the "the other insurance" provision in the Lexington Policy, when the Lexington Policy is excess, Lexington "will have no duty . . . to defend the insured against any 'suit.'" Ex. B at Section V., 4, b. The provision accords with the general rule under Texas law, "Where the insured maintains both primary and excess policies, . . . an excess liability insurer is not obligated to participate in the defense [of the insured]

until the primary policy limits are exhausted." *Texas Employers Ins. Ass'n v. Underwriting Members of Lloyds*, 836 F. Supp. 398, 404 (S.D. Tex. 1993), *citing* 14 *Couch on Insurance 2d* § 51.36 at p. 446. *See also Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5ᵗʰ Cir. 2002)("'The majority rule is that '[w]here the insured maintains both primary and excess policies . . . the excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted.''"), *quoting Keck, Mahin and Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W. 3d 692, 700 (Tex. 2000). Therefore from here on ACE must assume the complete defense of the MEP Parties because it is the primary insurer and "has the duty to provide a full defense to its insured" and is "fully liable for defense costs." *Tex. Prop. & Cas. Ins. Guar. Assoc./S.W. Aggregates, Inc. v. Southwest Aggregates, Inc.*, 982 S.W. 2d 600, 605 (Tex. App.--Austin 1998, no pet.).

Furthermore through its contractual and equitable rights to subrogation, Lexington is entitled to recover all defense costs it incurred since it exclusively assumed the defense of the MEP Parties under a reservation of rights on April 9, 2010. Ex. M. *See Tex. Health Ins. Risk Pool v. Sigmundik*, 315 S.W. 3d 12, 14 (Tex. 2010)(while the "made whole" doctrine permits denial of equitable subrogation to the insurer when the injured parties are not fully compensated and subrogation works an injustice, it does

not apply where the parties' agreed contract provides a clear and specific right of subrogation); *Employers Cas. Co. v. Transport Ins. Co.*, 444 S.W. 2d 606. 611 (Tex. 1969)("[T]he emphasis in granting relief, whether in subrogation or contribution, is upon the propositions that a performing insurer is not a volunteer; that a denial of contribution would unjustly enrich the defaulting insurer; and that one who pays money for the benefit of another is entitled to be reimbursed."). The Lexington Policy states that "if the insured has rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us." Ex. B at Section V, 8. Furthermore the "other insurance" clause in the Lexington Policy provides, "If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers." Ex. B at Section V, 4, b. *See Continental Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 87 (5th Cir. 2012)(based on clause stating "[i]f any Insured has a right to recover all or part of any payment we have made under this policy, those rights are transferred to us," the court held, "Under the terms of the subrogation clause, the [umbrella insurer] is entitled to reimbursement from the insurers who should have borne the costs that it paid."). Lexington concedes that ACE did not owe a duty to defend the MEP Parties prior to July 29, 2011, when Lexington first provided ACE with notice of the underlying suits and requested that ACE provide the MEP Parties with a

defense. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W. 3d 603, 608 (Tex. 2008)(holding that the policy's requirement that notice and delivery of lawsuit papers be given to, and a request for a defense be made on, the insurer "serves two essential purposes:  (1) they facilitate a timely and effective defense of the claim against the insured, and more fundamentally, (2) they trigger the insured's duty to defend by notifying the insurer that a defense is expected.").

Alternatively, Lexington argues that at minimum it is entitled to contribution for one-half of the defense costs it has incurred and will incur in defending the MEP Parties.  *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 592 F.3d 687, 694-95 (5th Cir. 2010)("To prevail on a claim for contribution, a party must show that '(1) the several insurers share a common obligation or burden and that (2) the insurer seeking contribution has made a compulsory payment or other discharge of more than its fair share of the common obligation or burden.'"), *citing Mid-Continent Ins. Co. v. Liberty Mut. Ins, Co.*, 236 S.W. 3d 765, 772 (Tex. 2007)("The effect of the pro rata ['other insurance'] clause precludes a direct claim for contribution among insurers because the clause makes the contracts several and independent of each other.").  On the other hand, the common obligation or ***duty to defend*** the insured allows contribution between insurers because "the duty to defend creates a 'debt which is equally and concurrently due by' all of its insurers."  *Trinity Universal*, 592 F.3d at 695, *quoting Mid-*

-36-

*Continent*, 236 S.W. 3d at 772.  Moreover the result is in accord with Texas law, which requires an insurer with a duty to defend the insured "to provide a *complete* defense."  *Id.* (emphasis in original).  Because Lexington has exclusively defended the MEP Parties and because it has therefore "paid more than its fair share of the common obligation" to defend them, it is entitled to recover ACE's pro rata share of the defense costs incurred to date.  *Mid-Continent*, 236 S.W. 3d at 772.  This Court should also find that ACE is obligated to equally share in future defense costs in the underlying lawsuits.

**ACE's First Amended Response (#28) and First Amended Cross-Motion for Summary Judgment (#27 and 29)**

Insisting that the ACE Policy does not owe a duty to defend or to reimburse the MEP Parties, ACE further argues that (1) the ACE Policy only provides additional insured coverage to the extent that Mustang was required by written contract to obtain coverage for the MEP Parties; (2) Mustang's duty to do so is limited "solely to the extent of [Mustang's] indemnity obligation" to the MEP Parties under the PSA, #29, Ex. C, ¶ 14.2; and (3) the indemnity obligation has not been triggered, as it does not include a defense obligation and does not apply until and unless Mustang's fault contributed to the losses at issue and the proportion of fault attributable to Mustang is determined.

ACE maintains that the MEP Parties do not qualify as additional insureds under the ACE Policy for purposes of the duty to defend in relation to non-employee third party claims.  The

language of the additional insured provision in Endorsement 20 of
the ACE Policy "dovetails with the **language in the PSA that limits
additional insured coverage to nothing more than Mustang's
indemnity obligation by providing that no person or organization is
an additional insured 'for broader coverage or greater limits of
liability than is required by said contract or agreement** . . . .'"
#25 at p.8 (emphasis added by the Court).  ACE highlights the
opening phrase of Section 14.2 of the ACE Policy as restricting
Mustang's obligation to obtain insurance coverage for the MEP
Parties "**[s]olely to the extent of Consultant's indemnity
obligation** . . . .," i.e., to the extent that Mustang's acts or
omissions contributed to the loss.  Again ACE contends that because
Mustang's indemnity obligation has not been triggered because it
does not encompass a duty of defense or reimbursement of defense
costs, or alternatively because Mustang has not been found at
fault, ACE also has no duty to provide additional coverage to MEP
and its affiliates in its defense in the underlying lawsuits.

Furthermore ACE asserts that the General Indemnity provision
in the PSA can be divided into two sections: the first relating to
claims and suits brought by employees of either Mustang or the MEP
Parties, the second section to claims by third parties who do not
fall into the former group.  Ex. C at p. 14.  In the first part,
according to ACE, in reciprocal provisions the MEP Parties and
Mustang agreed to defend, indemnify, and hold harmless the other
for any claims or causes of action for injuries or death suffered

by their own employees.  #25, Ex. C at p. 14.

### 13.  GENERAL INDEMNITY

[MUSTANG] SHALL <u>DEFEND</u>, INDEMNIFY, AND <u>HOLD</u> [MEP]
<u>HARMLESS</u> FROM AND AGAINST ALL CLAIMS, DAMAGES, LIABILITY,
LOSSES AND <u>EXPENSES INCLUDING, BUT NOT LIMITED TO,</u>
<u>ATTORNEY'S FEES AND OTHER COSTS OF DEFENSE</u> ATTRIBUTABLE
TO BODILY INJURY, SICKNESS, DISEASE, DEATH OR INJURY TO
THE EMPLOYEES OF [MUSTANG] OR DESTRUCTION OF PROPERTY OF
[MUSTANG], INCLUDING LOSS OF USE RESULTING THEREFROM AND
ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE
PERFORMANCE OF WORK HEREUNDER, IRRESPECTIVE OF [MEP'S]
FAULT OR NEGLIGENCE.  LIKEWISE, [MEP] SHALL <u>DEFEND</u>,
INDEMNIFY, AND <u>HOLD</u> [MUSTANG] <u>HARMLESS</u> FROM AND AGAINST
ALL CLAIMS, DAMAGES, LIABILITY, LOSSES AND <u>EXPENSES</u>
<u>INCLUDING BUT NOT LIMITED TO ATTORNEY'S FEES AND OTHER</u>
<u>COSTS OF DEFENSE</u> ATTRIBUTABLE TO BODILY INJURY, SICKNESS,
DISEASE, DEATH OR INJURY TO THE EMPLOYEES OF [MEP] OR
DESTRUCTION OF PROPERTY OF [MEP], INCLUDING LOSS OF USE
RESULTING THEREFROM AND ARISING OUT OF OR RESULTING FROM
THIS AGREEMENT OR THE PERFORMANCE OF WORK HEREUNDER,
IRRESPECTIVE OF [MUSTANG'S] FAULT OR NEGLIGENCE . . . .

*Id.* (emphasis added by ACE).  Thus under this provision Mustang

agreed to indemnify MEP for any settlements or judgments that MEP

might pay as a result of the claims by a Mustang employee,

regardless of MEP's fault or negligence, and MEP agreed to provide

the same indemnity to Mustang in connection with claims brought by

MEP employees.  Each party also agreed to defend the other and hold

the other harmless for any expenses including "attorney's fees and

other costs of defense."

In contrast, in the remainder of the General Indemnity

provision, the indemnification obligations of the two in a case of

third-party employees' claims or suits are more restricted, argues

ACE.  The parties did not agree to indemnify each other for the

fault or negligence of the other nor to defend, hold harmless or otherwise pay for the attorney's fees incurred by the other:

> **WHEN ANY INJURIES, DEATH OR ILLNESS OR DAMAGE TO PROPERTY ARE SUSTAINED BY THIRD PARTIES, AND ARE THE CONCURRENT CONTRIBUTION OF BOTH COMPANY AND CONTRACTOR, EACH PARTY'S DUTY OF INDEMNIFICATION SHALL BE IN THE SAME PROPORTION THAT THE ACTS OR OMISSIONS OF EACH PARTY CONTRIBUTED TO THE INJURIES, DEATH OR ILLNESS OR DAMAGE TO PROPERTY.**

Thus, argues ACE, Mustang agreed only to indemnify the MEP Parties for that proportional share of any settlement or judgment that corresponds to Mustang's percentage of negligence or fault that contributed to the loss at issue (with MEP having the same obligation to Mustang).  Moreover no determination has been made in any of the eight underlying lawsuits that any negligence or fault of Mustang contributed to any loss or damages claimed by the third parties.  There is also no language in the third-party section of the General Indemnity provision that MEP and Mustang agreed to defend and hold each other harmless for and against "expenses, including but not limited to attorney's fees and other costs of defense."  Because Mustang's indemnity obligation has not been triggered because it does not include a duty of defense or reimbursement of defense costs, or alternatively, because Mustang has not been found to be at fault, ACE also has no duty to provide additional insured coverage to the MEP Parties for their defense in the underlying lawsuits.  ACE argues that the Court should deny Lexington's motion for summary judgment and grant ACE's cross motion.

ACE compares Endorsement 20 in the ACE Policy (quoted on page

10-11 of this Opinion and Order), which specifically limits
additional insured coverage to what has been agreed to by the
parties in the PSA, to Endorsement 10 in the Lexington Policy,
which provides in relevant part broad additional insured coverage
to persons or entities that Lexington's named insured contractually
agreed to insure, lasting as long as the liability of the person or
entity arises out of the "work" or "product" of Lexington's named
insured:

> *A. Section II--Who is An Insured is amended to include
> any person or organization you are required to include an
> additional insured on this policy by a written contract
> or written agreement in effect during this policy period
> and executed prior to the "occurrence" of the "bodily
> injury" or "property damage."*
>
> *B. The insurance provided to the above described
> additional insured under this endorsement is limited as
> follows:*
>
>> *1. COVERAGE A BODILY INJURY AND PROPERTY
>> DAMAGE (Section -Coverages) only.*
>>
>> *2. The person or organization is only an
>> additional insured with respect to liability
>> arising out of "your work" or "your product"
>> for that additional insured.*

Ex. D, Endorsement No. 10.

Insisting that the PSA does not obligate Mustang to defend the
MEP Parties, ACE observes that indemnity agreements must be
construed in accordance with the same general principles of
contract construction applied to insurance policies. *Gulf Ins. v.
Burns Motors, Inc.*, 22 S.W. 3d 417, 423 (Tex. 2000). "A contract
of indemnity should be construed to cover all losses, damages, or
liabilities which reasonably appear to have been within the

-41-

contemplation of the parties, but it should not be read to impose liability for losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). Here the indemnity language does not include a duty to defend MEP or its affiliates with regard to claims by third parties. Because language of defense or hold harmless is not included in the indemnity agreement, it is clear that MEP's intent was to control its own defense rather than turn it over to Mustang or Mustang's insurance carrier. ACE argues that although the MEP parties could have required Mustang to defend them, they did not, but instead these parties are motivated to defend themselves so as to limit any finding that their acts or omissions contributed to the loss of damages as issue. Thus they have no obligation to indemnify any of the MEP Parties or costs in the underlying suits, so the ACE Policy does not cover such. The PSA only requires Mustang to cover the MEP Parties as additional insureds "solely to the extent of (Mustang's) indemnity obligation" to MEP in accordance with the PSA. Since no indemnity obligation has been triggered because it does not include the defense of the MEP Parties, the MEP Parties are not entitled to a defense as additional insureds under the ACE Policy, according to ACE.

Should the Court find that Mustang's indemnification duties to MEP include a duty to reimburse defense costs, ACE further contends that such an obligation is not triggered until the proportional

-42-

share of loss caused by Mustang has been determined, in accordance
with the General Indemnity provision, an event that has not yet
happened.  Even then, Mustang's obligation would be limited to the
proportional share of the loss that corresponds to its proportional
share of the total liability or fault in relation to that of the
MEP Parties.

**Lexington's Response (#30) to**

**ACE's Cross-Motion for Summary Judgment**

Lexington contends, and the Court agrees, that ACE's arguments
are irrational, unreasonable and inconsistent with Texas law and
recognized insurance coverage principles governing an insurer's
duty to defend.  Lexington agrees that the additional insured
status of the MEP Parties is limited in the PSA by its phrase
"[s]olely to the extent of [Mustang's] indemnity obligation," but
Lexington construes this provision in accordance with Texas law to
mean that the MEP Parties are additional insureds and that ACE has
a duty to defend them when the allegations contained in the
pleadings in the underlying lawsuits potentially trigger Mustang's
indemnity obligation, as they do here, so the MEP Parties are
additional insureds entitled to a defense under the provisions of
the ACE Policy.  The phrase "[s]olely to the extent of [Mustang's]
indemnity obligation" in the PSA does not limit coverage; it limits
the circumstances under which the MEP Parties are entitled to
coverage as additional insureds.  ACE irrationally argues that the
phrases  "[s]olely to the extent of [Mustang's] indemnity
obligation" in the PSA and "not for broader coverage or greater

-43-

limits of liability than is required by said contract" in the ACE
policy function to deny additional insured coverage to the MEP
Parties because, contrary to Texas law, these phrases mean that the
MEP Parties are not additional insureds unless and until Mustang is
actually required to indemnify the MEP Parties under the PSA.
Lexington interprets the provisions of the PSA and the ACE Policy
together because the PSA does require Mustang to add the MEP
Parties as additional insureds to its insurance policies, including
the commercial general liability policy issued by ACE.  Thus Ace
inverts the obligations to defend and to indemnify.  ACE also
strangely argues, without citation to any legal authority, that the
language of Mustang's indemnity obligation replaces the terms of
the ACE Policy, including the defense obligations, and that ACE has
no obligations under its insurance policy except for Mustang's
obligations under the PSA.  It is illogical to conclude that the
parties would negotiate for an additional insured provision in the
PSA to provide insurance coverage to the MEP Parties that word-for-
word mirrors Mustang's obligation to indemnify the MEP Parties in
the same contract.

    As discussed, it is well established that an insurer's duty to
defend is based on allegations in the underlying pleadings.  The
indemnity interpretation is made after the facts in the underlying
lawsuits have been developed through litigation, while, in
contrast, the duty to defend under Texas law arises when
allegations in the pleadings *potentially* trigger coverage.  There

is no legal precedent for ACE's position.

Here the ACE Policy clearly and unambiguously states that ACE has "the right and duty to defend the insured against any suit seeking damages for bodily injury or property damage." ACE ignores this language in its arguments. Courts reject interpretations of contracts that render certain provisions meaningless or illusory, and the Court should not allow ACE to rely on, nor should the Court accept, an interpretation of the ACE policy that would transform ACE's defense obligation into mere surplusage, as is the effect of ACE's argument. The pleadings in the underlying lawsuit allege wrongful conduct on the part of the MEP Parties and Mustang that potentially triggers coverage under the ACE Policy and initiates ACE's defense obligation. Because the ACE Policy obligates ACE to defend insureds in suits alleging bodily injury or property damage, regardless of whether the allegations are true or false, the MEP Parties are entitled to additional insurance coverage and a defense in the underlying lawsuits under the terms, conditions, and provisions of the ACE Policy.

Lexington cites *Aubris Resources LP v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 483 (5th Cir. 2009), as analogous and relevant to this suit. In *Aubris*, United Oil and Minerals ("United"), a property owner, hired contractor J&R Valley Oil Services ("J&R") to service its oilfield properties. Under their services agreement, J&R was required to carry commercial liability

insurance and to name United as an additional insured under the policy.  566 F.3d at 485.  There was also a general indemnity provision in the same service agreement stating that United agreed to indemnify J&R for expenses in defending against causes of action arising from United's own negligent acts or omissions.  566 F.3d at 485.  J&R's general liability policy covered additional insureds, but only where such coverage was specifically required in a written agreement.

After an explosion at an oilfield serviced by J&R seriously injured one and killed another J&R employee, a number of state court suits were filed against J&R and United alleging negligence. J&R was dismissed under the Texas Workers' Compensation Act, but the suits proceeded against United.  The insurer, St. Paul Fire and Marine Insurance Company ("St. Paul"), denied coverage, arguing that the general indemnity provision in the services agreement limited the scope of United's additional insured coverage in the same agreement.  United then filed a declaratory judgment asking the court to declare that St Paul had a duty to defend United in these underlying lawsuits.

The parties disagreed about the effect of two provisions in the service agreement:  the additional insured provision (United is "an additional insured except with respect to any obligations for which UNITED has specifically agreed to indemnify" J&R)  and the general indemnity provision (United will indemnify J&R for causes

-46-

of action arising from United's own negligence).  St Paul read them together and concluded that there was no coverage for United in causes of action arising from United's own negligence.  United contended that there is no relationship between the two provisions and that coverage is determined by reference only to the additional insured provision, which United construed as establishing that it is an additional insured unless it separately and extra-contractually agreed to indemnify J&R regarding the litigation. Because United had not separately agreed to indemnify J&R for the state court suits, United maintained that the litigation is covered under the St. Paul policy.  The district court granted summary judgment in favor of St. Paul because it agreed with St. Paul that the general indemnity provision limited the additional insured coverage.

On appeal, the Fifth Circuit vacated the summary judgment and rendered judgment in favor of United based on Texas case law, particularly the rule of *Hudson Energy*, 811 S.W. 2d at 555 (Where a provision is susceptible to more than one reasonable interpretation, especially where it is a limitation on liability, the court must construe it in favor of the insured as long as that construction is not unreasonable, even if the insurer's interpretation is more reasonable).  The Fifth Circuit agreed with United and found *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W. 3d 660 (Tex. 2008)(in determining whether there is

coverage, the court should look only to the additional insured provision and the scope of additional insured coverage is not limited by the separate indemnity provision), to be on point and "instructive" since it also involved the issue of whether the parties' indemnity agreement operated to limit the scope of ATOFINA's additional insured coverage. 566 F.3d at 488. Noting that the services agreement in one section specifically required that United be named an additional insured under J&R's policy and that in a separate section the service agreement included the general indemnity provision, it had opined that in *ATOFINA* the Texas Supreme Court stated that "where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity clause." 566 F.3d at 489, *citing ATOFINA*, 256 S.W. 3d at 664. Moreover it found that United's interpretation of the additional insured provision was not unreasonable and required coverage unless United separately and extra-contractually agreed to indemnify J&R, and that United had not done so. *Id.* at 490.[18] The

---

[18] ACE distinguishes *Aubris* from the situation here and argues not only that *Aubris* does not apply, but that *Aubris* supports ACE's position instead of Lexington's. To determine the additional insured provision coverage, the *Aubris* panel addressed "the relationship between and among the policy, the additional insured provision in the services agreement, and the indemnity provision in the services agreement." 566 F.3d at 487. ACE has urged the Court to do so here. Contrary to Lexington's contention, the court did not limit its review to the insurance policy, but distinguished the additional insured provision from the general indemnity provision in the underlying services

Fifth Circuit found it "improbable that the general indemnity

---

agreement.    The additional insured provision in the services
agreement in *Aubris* stated that there would be "no additional
insured coverage for any obligations for which UNITED has
**specifically** agreed to indemnify [J&R].'" (emphasis added by
ACE).   ACE states that the Fifth Circuit narrowly construed the
exception to apply only to a specific agreement between the
parties for indemnity with respect to the specific underlying
tort claim, i.e., to require the contractor to separately agree
to indemnify the owner for the specific tort lawsuit that had
been filed against the owner.   566 F.3d at 489-90.   The appellate
court opined, "The qualified 'specifically' reasonably can be
read to indicate that United intended to forego additional
insured coverage only in the event United makes a separately
considered and extra-contractual decision, i.e., to *specifically*
agree to indemnify J&R Valley."   *Id.*   ACE argues that because the
general indemnity provision in the services agreement in *Aubris*
did not provide for such specific indemnity, the Fifth Circuit
found the argument that the exception to the additional insured
provision did not apply was reasonable and thus decided that the
additional insured coverage was applicable.   *Id.*   In the instant
case the insurance clause in the PSA does not refer to "specific"
indemnities owed by Mustang; instead the PSA generally limits the
required coverage "*to the extent of [Mustang's] indemnity
obligation.*"   Ex. C to ACE's Cross-Motion at p. 15.   "The
language textually ties the additional insured requirements of
the PSA to, and makes them dependent upon, the applicable
indemnity language of the PSA," without any mention of a duty to
defend, hold harmless, or otherwise cover MEP's attorneys' fees
or defense costs.   #32 at pp. 8-9.   ACE further asserts that the
language of the additional insured provision in Endorsement 20 of
the ACE Policy is linked to the language in the PSA limiting
additional insured coverage to Mustang's indemnity obligation by
providing that no person or organization is an additional insured
"for broader coverage or greater limits of liability than is
required by said contract or agreement."   Because these
provisions are unambiguous, ACE argues that they must be
enforced.
     ACE further distinguishes *Aubris* on its indemnity
provisions' language in the underlying service contract that the
contract would "defend, indemnify and hold harmless" the alleged
additional insured as to claims arising from the contractor's
negligence.   The issue in the instant case, i.e., whether a
policy providing for additional insured coverage that is limited
to the extent of the contractor's indemnity includes a duty to
defend, was not an issue in *Aubris*.

provision of the oil services agreement would determine an
additional insured obligation.  To hold otherwise arguably would
ignore the parties' true intent in negotiating insurance coverage
for the operations performed under the oilfield services agreement
. . . or would risk rendering the additional insured requirement
meaningless." *Id.* at 490.

Lexington analogizes the situation here to that in *Aubris* and
finds that like the additional insured requirement in *Aubris*, the
additional insured requirement here contains a limitation that
expressly refers to the indemnity provision.  As in the Fifth
Circuit's reasoning in *Aubris*, Lexington argues that the additional
insured provision here is not affected by the indemnity provision
as long as the allegations in the underlying lawsuits potentially
fall within the concurrent-contributory indemnity language.
Similarly this Court should reject ACE's contention because it is
"improbable the parties intended that the general indemnity
provision . . . would determine an additional insured obligation"
and such an interpretation would "risk rendering the additional
insured requirement meaningless."

Lexington argues that here its interpretation of the language
in the ACE Policy and the PSA is reasonable.  Even if the Court
finds that ACE's position is also reasonable, the Court should
construe the documents in favor of providing the MEP Parties with
coverage.  *Hudson Energy Co.*, 811 S.W. 2d at 555 ("[I]f a contract

-50-

of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured.").[19]

When the insurer has a duty to defend an insured, it must provide " a *complete defense*." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 832 F.3d 546, 559 (5th Cir. 2004), *citing Tex. Prop. &*

---

[19] ACE objects that as a stranger to the contract, Lexington's interpretation is irrelevant. It maintains that the rule of *contra proferentem*, construction against an insurer, does not apply where the party putting forth that interpretation is a stranger to the contract. For the proposition that finding injured third party cannot invoke construction against the insurer, ACE cites *Cannon Ball Motor Freight Lines v. Grasso*, 59 S.W. 2d 337, 342-43 (Tex. App.--San Antonio 1933), *aff'd*, 124 Tex. 154 (Tex. Com. App. Apr. 3, 1935), *superseded on other grounds by rule as stated in H.E. Butt Grocery Co. v. Bilotto*, 985 S.W. 2d 22, 24 (Tex. 1998).
     ACE's argument is not accurate. *Cannon Ball* actually states,

     Under accepted rules for the construction of contracts, where a stranger contends that it was intended that the provisions of a contract should inure to his benefit, such intention must be clearly apparent. In the policy under consideration, it does not clearly appear that the injured parties shall have primary rights against the insurer, but, on the contrary, it does appear, as pointed out that there is to be no primary liability as to injured parties. In *Van Derhoof v. Chambon*, 121 Cal. App. 118, 8 P.2d 925, 930, the court said:

     "Nowhere in the policy is there any express contract of direct liability to third persons. An intent to make an obligation inure to the benefit of a third party must clearly appear in the contract, and if there is any doubt about it, it should be construed against such intent." [citations omitted].

*See also Camco Oil Corp. v. Vander Laan*, 220 F.3d 897, 899 (5th Cir. 1955), quoting *Cannon Ball*, 59 S.W. 2d at 342.

*Cas. Ins. Guar. Ass'n/S.W. Aggregates, Inc. v. S.W. Aggregates, Inc.*, 982 S.W. 2d 600, 606 (Tex. App.-Austin 1998, no pet.)(emphasis in original).  ACE argues that summary judgment should not be granted because there is a genuine issue of material fact as to the amount of the defense costs.  Lexington responds that Shirley LeFever's affidavit (#23, Ex. A, at ¶ 8, setting forth the total amount of defense costs that Lexington has incurred up to the point of submission) is sufficient, uncontroverted evidence of the defense costs which Lexington has exclusively paid to support summary judgment in Lexington's favor.  *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 722 (5th Cir. 1995)(holding that uncontroverted affidavit setting forth attorney's fees and costs satisfied summary judgment burden; the adverse party must present competent evidence to raise a genuine issue of fact for trial about a fee award); *Sorola v. City of Lamesa*, 808 F.2d 435, 437 (5th Cir. 1987)(granting summary judgment where non-movant failed to present facts contradicting movant's sworn affidavit).  ACE's conclusory allegations that the defense costs incurred by Lexington were unreasonable and unnecessary cannot create a fact issue.  Moreover, ACE has not presented any evidence that the defense costs incurred in defending the MRP Parties are unreasonable or unnecessary. Furthermore, Lexington's contractual obligation to provide the MEP Parties with a defense necessarily included an obligation to pay only reasonable and necessary defense costs.  The determination of

ACE's duty to defend does not depend on the amount of costs incurred by Lexington, but only on whether ACE has a duty to defend the MEP Parties as a matter of law.  To the degree that the Court may find a fact issue as to the amount, the reasonableness, and/ or the necessity of the defense costs that Lexington has incurred, it is appropriate for the Court to grant Lexington's motion for summary judgment and determine these matters later.  *See, e.g., Trinity Univ. Ins. Co. v. Employers Mutual Cas. Co.*, 592 F.3d 687, 694-95 (5th Cir. 2010).

Finally Lexington points out that while ACE contests only whether the MEP Parties qualify as additional insureds and whether damages is a genuine issue of material fact that precludes summary judgment, Lexington has also raised and supported issues regarding its right to bring suit in this action, the respective coverage priority between the Lexington and ACE Policies, and the sufficiency of the allegations in the underlying pleadings to trigger ACE's duty to defend.  Where a party fails to respond to arguments in the opposing party's motion for summary judgment, the points are conceded.  *T&T Geotechnical, Inc. v. Union Pacific Resources Co.*, 944 F. Supp. 1317, 1322 (N.D. Tex. 1996); *Baker v. Am. Airlines, Inc.*, No. 4:03-cv-604-A, 2004 WL 2070949, at *4 n.6 (N.D. Tex. Sept. 15, 2004)(same).  Lexington asks the Court to treat the following matters as conceded by ACE:  (1) Lexington is entitled to bring this lawsuit to recover all defense costs it has

paid on behalf of the MEP Parties; (2) the allegations in the underlying lawsuits trigger the duty to defend under the ACE policy and the PSA; (3) the ACE Policy provides primary coverage and the Lexington Policy provides excess coverage, thereby making ACE solely responsible for the defense of the MEP Parties; and (4) Lexington is entitled to recover all defense costs incurred after ACE's duty to defend was triggered.

### ACE's Reply (#31)

Ace reiterates its stance on construction of the ACE Policy and the PSA, that the ACE Policy only provides additional insured coverage to the extent that Mustang was required by contract to obtain that coverage for the MEP Parties, i.e., coverage limited "solely to the extent of [Mustang's] indemnity obligation to the MEP Parties. Under section 13 of the PSA Mustang's indemnity obligation to MEP for third party claims does not include a duty to defend, hold harmless, or otherwise cover MEP's attorney's fees. Lexington contends that the eight corners rule and other Texas precedent regarding the duty to defend have no application to this action because Mustang never agreed to defend MEP against third-party liability claims or to obtain insurance coverage for such a defense. Thus Lexington's construction of the ACE Policy and the PSA is not reasonable.   Even if it had shown that there is coverage, Lexington also failed to meet its burden to show that the fees it incurred in defending the MEP were reasonable and necessary

or their amount.  The single conclusory sentence in LeFever's affidavit, "To date, Lexington has incurred at least approximately $1,793,535.49 in defense costs and expenses as the sole insurer to defend the MEP Parties in the underlying lawsuits," is insufficient.  Lexington provides no evidence to substantiate this amount, how much of this total was incurred after it requests that ACE participate in the defense, and evidence showing the amounts paid were reasonable and necessary.

### Court's Decision

After a careful and thorough review of the briefs and attached evidence, the Court concludes as a matter of law that Lexington's motion for summary judgment should be granted for the reasons it states and ACE's cross motion denied.  The Court agrees with Lexington that ACE's construction of the various policies, which are not ambiguous, and the PSA is contrary to established Texas law regarding an insurer's duty to defend and duty to indemnify.  The Court finds as a matter of law that the MEP Parties are additional insureds under the terms of the PSA, #23 Ex. D, sections 13 and 14, and of the ACE Policy, Ex. C, Endorsement 20, which policy constitutes the MEP Parties' primary insurance.[20]  The Court further determines that the allegations of negligence and resulting bodily injury caused by an explosion ("occurrence") during the policy

---

[20] As noted, Mustang, as a subsidiary of John Wood, is a named insured under Endorsement 18 of the ACE Policy.

period against the MEP Parties and Mustang concurrently in the pleadings in the eight underlying suits are potentially within the scope of coverage of the ACE Policy and therefore triggered ACE's duty to defend.[21] The Court further concludes that the ACE Policy is primary to the Lexington Policy, with the later providing excess coverage. Moreover, Lexington is entitled to recover from ACE reasonable and necessary defense costs incurred after tendering the defense of the MEP Parties to ACE on July 29, 2011.[22] Finally the Court determines that ACE is solely obligated to provide a defense to the MEP Parties in the underlying lawsuits until they are resolved.

The Court observes that even if ACE's construction were reasonable, but the Court denies it is, Lexington's interpretation in accord with Texas law and favoring coverage of the additional insureds would prevail.

Accordingly, the Court

ORDERS that Lexington's motion for summary judgment (#23) is GRANTED and ACE's amended cross-motion (#27) is DENIED.

While the Court agrees that under the Lexington Policy Lexington is entitled to recover its fees and costs in defending

---

[21] Only if these allegations are proven true in the state court cases will ACE's duty to indemnify be triggered.

[22] According to the Supplemental Payments section of SCE's Policy, the expenses ACE incurs in defending an insured against suit "will not reduce the limits of the insurance." Ex. C at p.8.

the MEP Parties in the underlying suits from July 29, 2011 through their resolution, it agrees with ACE that the conclusory statement in LeFever's affidavit that those fees and costs up to the time of submission of the motion for summary judgment amount to $1,793,535.49 is insufficient for the Court to determine whether the amount is necessary and reasonable. Accordingly, the Court

ORDERS Lexington to submit within twenty days more extensive materials in support of its request for reimbursement of fees and costs from April 29, 2011 up to this submission. Defendants shall file a timely response or inform the Court that the submission is unopposed.

Once the Court determines the appropriate amount up to this point, it will issue a final judgment by separate order.

**SIGNED** at Houston, Texas, this  7th  day of  July , 2014.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE